The Court will now call 118254 Christine O'Toole v. Chicago Zoological Society. Are you ready to proceed? Yes, Your Honor. Ready? Good morning, and may it please the Court, Counsel. My name is Mike Rieses, and along with Nick Kopateris of our office, I'm here today on behalf of Dependent Appellant Brookfield Zoo. The appellate court reversed the trial court and held that the zoo could not assert the one-year limitation period as a not-for-profit corporation under Section 1-206 of the Tort Immunity Act. We respectfully submit that the appellate court misapplied this court's test in Carroll in holding that the zoo was not organized for the purpose of conducting public business. If we are correct, the judgment below cannot stand. The Tort Immunity Act permits a not-for-profit corporation to assert immunity as a local public entity when it is organized for the purpose of conducting public business. Beginning with Carroll, this court held that the term public business requires first that the activity benefits the entire community without limitation. Although the appellate court did not address this requirement, the zoo clearly meets this first part of the Carroll test. Under the 1923 enabling law, the General Assembly mandated free public access 52 days of the year and the year around for organized groups of Illinois school children. Unlike the private school in Brugger, for example, which did not attempt to provide its services to the entire community, the zoo must operate with a legislative mandate of free public access. Ordinary non-profit corporations do not have the same mandate. The mandate of free public access is not only probative of legislative intent that the zoo should benefit the entire community without limitation, but it's also one of the ways that the zoo is tightly enmeshed with government under the Carroll test. Next, under Carroll, a not-for-profit corporation is tightly enmeshed with government either through direct government ownership or operational control. If the parties should be able to agree on anything today, they should be able to agree that a not-for-profit corporation may satisfy either prong, one or the other, but need not satisfy both prongs. The appellate court dismissed the ownership prong by noting that the Forest Preserve District did not own the zoo business itself and all the property used to operate the business. That is in paragraphs 21 and 28 of the opinion. What the court did not appreciate was that a not-for-profit corporation does not have stockholders and that it is not a business that can be owned by anyone, much less by a government unit. The government can own shares in General Motors. It cannot own shares in a not-for-profit corporation because a not-for-profit corporation has no shareholders. Under the General Not-for-Profit Corporation Act of 86, a not-for-profit corporation is organized for non-business purposes. It can have members, it can have directors, it can have officers. It cannot have shareholders. For the ownership prong to have any practical meaning, we respectfully submit that it must be based on public ownership of the land, the facilities, the funds, and other property critical to the non-pecuniary purposes for which the not-for-profit corporation is organized. The appellate court's overly restrictive approach here is based on a fundamental misunderstanding of what a non-corporation is. Is this a balancing between the factors that the plaintiffs point out that would make one consider that the zoo isn't a local public entity versus your factors which indicate it would? I think you have to take all of the factors into account. There is a totality of circumstance here. You can't just look at some things and not look at other things. But I don't know that it's a balance because I would submit that the relevant factors, starting with ownership, clearly meet the ownership prong of the Carroll test. Let's go over some of those factors. First, we're talking about ownership for the moment. The Cook County Forest Preserve owns all of the land on which the zoo is situated and has so since it was founded pursuant to the 1923 enabling law. Two, the Forest Preserve owns all of the property, facilities, and collections purchased with public funds. Three, the public funds in turn are the proceeds of a tax levy specifically by law to support the operation and maintenance of a zoo on Forest Preserve land. That's Section 41 of the Act. Does the record tell us the percentage of funding of taxpayer dollars? What the record shows is in response to a request with MIT, we stated that it was approximately 50 percent or somewhat less than 50 percent. And, Justice Tice, I think what's relevant here is not necessarily the percentage of funding because this court in Carroll made it clear that the level of funding is not determinative. What is important is whether the corporation is organized for the purpose of conducting public business. And what we think is the most relevant is the fact that we have an entity that receives direct public funding. In fact, the county treasurer is charged with keeping the proceeds of the levy in a separate fund by statute. That's Section 42, I think, of the Forest Preserve District Act. And then it is dispersed directly as a budget item to the zoo. And fifth and finally, the Cook County Forest Preserve District is authorized by law to issue bonds to meet the zoo's major repair and capital needs. Now, in Brugger, this court clearly anticipated that a not-for-profit corporation that conducts public business could receive direct public funding as the zoo does here. There, this court noted that the private academy which received student tuition payments were, quote, not direct payments from the state budget, close quote, not direct payments from the state budget. Unlike the private academy in Brugger, the zoo's operations are funded directly by a tax collected by the county treasurer, kept in a separate fund, and dispersed for that purpose and that purpose alone. Again, an ordinary not-for-profit corporation does not receive direct public funding from the segregated proceeds of a tax. The zoo exists today only because of the 1923 law and the expenditure of specifically earmarked tax dollars authorized for its establishment, operation, and maintenance. This court upheld that tax levy 75 years ago in People, Exwell, Lindheimer v. Hamilton. Under Section 40 of the District Act, the legislature gave the Forest Preserve the choice of instrumentalities by which to accomplish the statutory objective of having zoos established and maintained on their land. Whether it operates the zoo directly or through a contract, Brookfield Zoo, once established and maintained on public land with direct public funding and operated subject to the mandate of free public admission, became tightly enmeshed with the Cook County Forest Preserve District. Further, the zoo is tightly enmeshed with government through direct operational control under the operating agreement. One, the zoo must submit an itemized budget to the district, which has the right to disapprove specific items relating to the expenditure of public funds. Two, the zoo must submit an annual audit and certified copy must be sent to the district. Three, the zoo must allow its books remain open to inspection by the district's auditors. Four, the district's president serves as a member of the zoo's board of trustees, that's its governing body, and three other members of the district serve as ex-officio members of the governing members without compensation. Five, the district has access to the grounds, buildings, and enclosures for policing and supervision with due regard for the safety and welfare of the animals. Six, the zoo cannot, without the district's consent, sell or encumber or mortgage any animal, building, enclosure, structure, or other property. Seven, the zoo cannot remove animals for exhibition elsewhere without the district's written consent. And eight, the proceeds of any sale of an animal by the zoo is to be used only for the purpose of increasing the number or improving the quality of the animals and collection. Is there any significance in the fact that you have claimed to be outside the Freedom of Information Act because you're not a public body? Your Honor, that is an excellent question because what this court recognized in root was that one possible indicia of control would be whether the nonprofit is subject to the Open Meeting Act or FOIA. Let's start with those statutes. Those statutes by their terms apply to public bodies. Section 1-206 of the Tort Immunity Act is more broadly written to protect a nonprofit corporation that conducts public business. It is entirely consistent for us to assert, as we did back in 2009, that we were not, that the zoo was not subject to FOIA. But that's because the two statutes have different objectives and they're worded differently. The Freedom of Information Act applies to public bodies. It also applies to private contractors that perform a government function, a government function. The statute that we're talking about here, 1-206 of the Tort Immunity Act, does not require any performance of a public function. It has been amended more broadly to extend immunity to a nonprofit that conducts public business. And we know from this court's Carroll test that public business can be satisfied if there's either ownership or control. So the two are separate and distinct. I understand that there is a relevance to the question. But to be clear on this, they are different in terms of the wording and in terms of the tests that are applied. So it's possible that the legislature intended to extend the immunity but not necessarily require the type of rigorous disclosure under FOIA or the Open Meetings Act. Mr. Reces, what other institutions would be affected by a decision that the zoo is or is not a local public entity? Well, we have an amicus brief that was submitted. And the relationship, close historical relationship that the zoo has with the district is only one of a number of similar relationships by which the people of this state have benefited for maybe the past century. So we have the Art Institute, which is on Park District land. We have the Field Museum, which is on Park District land. We have, I think, the Chicago Botanical Gardens, which is on Forest Preserve District land. We have the Museum of the Parks, which I think is on Park District land. There are a number of similar relationships structured by the General Assembly to benefit the people of this state. And they have, the legislature has allowed the different units of government to structure those relationships in such a way that is beneficial to the people without limitation, but subject to some type of either ownership of property or control of operations. Now, the appellate court in this case noted that over 90% of the trustees and governing members are not employed by the district. But nothing in the case law is required that elected officials constitute a majority of the nonprofit corporation's governing body. In fact, in Brugger, this court suggested that this was not required. The point here is that the district, through the statute and the operating agreement, is satisfied that its representation on the board allows for adequate oversight and control of the expenditure of public funds. Ordinary nonprofit corporations doing business with the government do not have public officials sitting in an official capacity on their governing boards. To conclude by way of summary, one, the zoo was organized to benefit the entire community without limitation. Two, the zoo is tightly enmeshed with government through direct government ownership of property and direct public funding. Three, the zoo is tightly enmeshed with government through direct operational control over fiscal matters subject to outside review and oversight. We believe that this case can be resolved applying the Carroll test properly. It may need to be refined only in the sense that the direct governmental ownership prong has to recognize that the ownership that is relevant is ownership of the land, ownership of the funds, ownership of the facilities, and ownership of the other personal property essential to carrying out the non-pecuniary purposes for which the nonprofit was organized. Are you asking us to overrule Carroll versus Paddock? We are asking you to apply Carroll properly, not to overrule it. The only point we're trying to make is that ownership has to be ownership not of a, quote, because it doesn't, the business doesn't have stock, doesn't have shares, but it has to be ownership of, again, the real estate, the funds, the personal property essential to the mission of the nonprofit. If in response to Carroll, couldn't the legislature have amended the Tort Immunity Act if it wanted to? It always could do that. It has seen fit not to do that. And as I think I heard from an earlier argument this morning, once a statute has been judicially construed, the judicial construction becomes part of the statute, and we're not here to say otherwise. But we have to recognize that this case presents some unique facts that were not present in Carroll and that were not present in Brugger. We have a mandate of free public access. No other case has ever addressed that. We have direct public funding through a specific tax. No other case has ever addressed that question. We have official representation on the governing body of the nonprofit corporation. No other case has ever addressed that. We're not asking you to change the test. We're asking you to apply the test to the circumstances, not balancing, but the totality of the circumstances at issue here. For all the reasons in our brief, we ask you to reverse the appellate court and to affirm the circuit court. Thank you. Thank you. Thank you, Justices. My name is George Brugis. I represent Christine O'Toole. May it please the court, counsel. What we're asking is that you affirm the appellate court and hold that Brookville Zoo is not a local public entity. And to answer a question that was asked in a previous case, you can't get to where the zoo wants to go without overruling Carol, Ruger, and Amelia. And the reason is because the first analysis is to look at the statute. And what the statute says is that not-for-profits can be considered local public entities and have the benefit of tort immunity if they're conducting public business. And that's what the statute says. And in Carol, you adopted the definition of conducting public business from the Amelia case. If you remember, Amelia was a case where Symphony was sued after someone was hurt at one of the concerts. And Amelia did a very detailed analysis of the Tort Immunity Act and specifically looked at what was meant by the phrase conducting public business. And in order to define that, they looked to the Constitution where they talk about public welfare and education and safety and welfare. And in Amelia, the appellate court said that, well, Symphony has some very important cultural benefits to the community, but it's not conducting public business because it's always been a fine art and extracurricular activity. And in Amelia, they did have a very specific educational purpose for the Symphony, giving music lessons. And the appellate court recognized all that and said that it's not public business. I think ZOO is even farther removed than Symphony from what would be traditional government functions. And so I think if you start right at the beginning and look at the statute and interpret the statute as to what conducting public business is, we have to say that, well, ZOO has cultural benefits to the public. It's not a traditional role of the government. And therefore, you can end your inquiry right there. But if you want to go further, what they're talking about is ownership. And they're not talking about ownership of the corporation. The corporation is a not-for-profit corporation, the Chicago Zoological Society, that owns property, it owns vehicles, it owns computers, it has 200 employees. It runs the zoo. It has management, sole control management over the day-to-day operation of the zoo. Now, admittedly, the forest reserve district owns the property and the structures there. And I think the appellate court was correct in looking at the relationship between the park district and the Chicago Zoological Society as basically a landlord-tenant relationship. They made a big deal in the appellate court and the briefs here about, well, the contract prohibits the zoo from cutting down any trees or doing anything with the buildings or doing anything else with the land. But that's something that you typically find in any landlord-tenant relationship, any landlord-tenant contract. What happened here was that the park district has... the forest reserve district has the property and the buildings, and they look for someone with the expertise to come in here and run the zoo. And they found the Chicago Zoological Society, which has nothing to do with any statute. It's a private, not-for-profit corporation that was set up to run that for the forest reserve district. And it's renewable every 20 years. So it's an arm's-length relationship between the forest reserve district and Brookfield Zoo. When they talk about... You just said that it was the forest reserve district that wanted somebody to run the zoo. So it was their request to have someone run the zoo? Or did the Zoological Society come in and ask the forest reserve? What were you saying? Well, I mean, they were started about the same time. When the legislature passed the Forest Preserve Act that permitted them to fund a zoo on their property, the Chicago Zoological Society was started shortly thereafter to fill that need. But, I mean, in all the cases that have looked at the relationship, including the Seventh Circuit in Brock, they said that they specifically wanted, the legislature specifically wanted, an independent entity to run the zoo on the forest preserve property. And that's why they set up the Chicago Zoological Society to be an independent, not-for-profit corporation to work on the forest preserve plan and run the zoo. Because I don't think... I don't mean any disrespect. I don't know that you want local public officials being responsible for the animals and the very, very technical nature that it takes to run a zoo on a property like that. They want somebody with that special expertise to operate the zoo. And that's why they... It looks like they wanted an independent entity. And in Brock, the Seventh Circuit kind of analyzed that and said that the Forest Preserve District has never exercised any of their authority that they have in these contracts to try and tell the zoo what to do and how to run the day-to-day operations or manage the zoo. But when they... The point I wanted to get to was when they're talking about ownership, they're talking about funding is really what they're talking about. Because I didn't really understand their whole argument because Chicago Zoological Society is an independent corporation. And they have employees and they have property and they have this leasehold, this contractual interest that they have with the Forest Preserve District to operate the zoo there. And they run it. And it's an entity. And to say that because the Forest Preserve District owns the property that they lease somehow can transform this private entity into doing public business or being enmeshed, I don't understand that. It's a separate entity. It's not owned by the Forest Preserve District. It's not owned by the public. It's a private corporation. But the public pays a certain amount of money based on taxes to that entity to run the zoo for the Forest Preserve. Someplace between 0% and 49%. So that if you look at the cases that have talked about funding, and I think Carol and Gruber both talked about funding and said they're not important. I mean, the appellate court holding in Gruber was that the public paid 65% of the funding for this clinic. And because it was only 65%, that was not substantial public funding. And the appellate court said, based solely on the funding being 65%, we're going to hold that as not a local public entity. It's not conducting public business because 65% is not enough. Here we have admittedly less than 50%, and we don't know how much less than 50% they're funding. So it doesn't fit any of those prior decisions that we've talked about as to what portion of public funding would make a non-for-profit into the benefit of having, toward immunity, a local public entity. The federal district case, there was a mental health clinic that had 95% public funding, and the district court said in that situation that that's sufficient, a sufficient amount of public funding for the non-for-profit to qualify as a benefit of community. The district is represented on the zoo's governing board. So why that's important? And the district approves the zoo's annual budget. We don't know that. Because what the contract says is that the district has the right to look at the budget. However, in the absence of them taking any action, it's automatically approved. And I think the appellate court pointed that out in their opinion. So there's no evidence in this case that the district has ever done anything to contest anything the zoo wants to do. But when we talk about how many members of the park district or the reserve district, there are on the board, there's the trustees and then the governing body. It's important because one of the things that we said in Carroll and in Brugger is that when public officials control the board, then that would be some addition that they're conducting public business and would qualify for toward immunity. And what they said both in Brock and in the appellate opinion in this case was that because 97% or more are not public officials, there's only a handful, one or two public officials and a trustee, and only four out of the 200 governing members, that it's such a very, very minuscule percentage of the people that run this not-for-profit corporation that there's no way that you could say that a public entity is controlling the board there. And I think you can compare that to a local public entity not-for-profit corporation actually like METRA, where the board, METRA board in Smith, we held that METRA was a not-for-profit that would be entitled toward immunity because they are conducting public business. But you look at the METRA board, and it's all people that are appointed by the government. The governor and then the different counties appoint the people to the METRA board. It's also like the Hubble case where we had the bi-state compact where the government appoints the board, and the board members are the ones that actually run the not-for-profit corporation. Here we have only one or two percent, three percent of the board members and the governing members of Brookfield Zoological Society are government members. And so whereas in METRA and the bi-state compact, clearly the government is running those boards at the Chicago Zoological Society, it's all independent. It's all independent except for these one or two people that the government is able to put on there. Let me ask you a procedure question. We've been hearing a lot of facts about how this entity operates. Where are we getting these facts? What facts do we need to look at? Where do they come from for us to be able to make this determination? So this is what happened. When they filed their motion to dismiss, saying that they were a local public entity as a not-for-profit, we did our research and we found the Brock case. And we basically crafted a set of requests to admit facts based upon the facts from the Brock case where the Seventh Circuit said based on these facts, clearly Brookfield Zoo is not a local public entity. And we set those facts out. We had several hearings in the trial court fighting over whether they had to admit them. And eventually Judge Kirby ordered them to admit almost all the facts. And so the only operative facts that are in this case are the request to admit fact. And then we also have the contract and the statute. And of course the contract says, the contract between the zoo and the Forest Preserve District says that the Chicago Zoological Society has complete control over the operation of the zoo. And that's, you know, you have ownership, which they don't own the corporation, the not-for-profit corporation. You have control through control of the board, which they don't have because they only have 1 or 2%, 3% of the board members. And then you also have who has the control over the means and method of running the zoo. And the means and method by the contract and by the statute says that Chicago Zoological Society, the defendant, has complete control over that. And again, I think if you look back at the history, it's because the legislature wanted an independent entity who had the special expertise to run the zoo because of the delicate nature of taking care of the animals. One of the questions that came up is, who else might this apply to? Well, if you look at the Tort Immunity Act, they have listed on there a number of entities, including museums. So there's no question that museum districts are the type of local public entity that is given protection of immunity under the Tort Immunity Act. And I made this point in my brief, is that when the legislature specifically includes museums, and they know that not only are there museums, but there's also zoos on public property, and they don't include zoos, that the legislature is expressing their intent that zoos are not to be included as a not-for-profit because we specifically put museums in there, and we didn't put zoos in there. Does it matter at all what activity the not-for-profit is engaged in? I think it's really important. I think that's Carroll adopting Omelia, where they have to be engaged in what is a traditional government function. And operating a zoo has cultural benefit, like the symphony, but it's not a government function. It's not a traditional government function like running a school or running a hospital would be, or public transportation. What about running a museum? Well, running a museum is not, I would say, a traditional government function, and that's why the legislature specifically included museums in the definition of what a local public entity is for the purpose of the Tort Immunity Act, because they realize that running a museum, a judge or a court may very well say that we're going to look at the Constitution and see what the basic function of government is to determine what conducting public business is, that a museum is cultural and it certainly has benefit to the public, but it's not a traditional function of government. It's not a traditional function of government like some of these other cases are. I don't think it was an issue in Carroll or Brewer because you had education and medical services, and those are traditional functions of government. Running a zoo isn't. I mean, it has a lot of benefit, but it's not something that the government is obliged to do, and there's no cases and there's no history of saying that the zoo has an obligation to run a government. The government has an obligation to run the zoo like the government might have an obligation for public transportation or hospitals or education, and there's a really big distinction. I think that's the first thing that you have to look at because what Amelia said is that if you're going to say symphony is a traditional function of government, then you're going to greatly expand what the Tort Immunity Act is going to give immunity for, and it's in the Constitution of the state of Illinois that government entities don't have immunity except as provided by the legislature. I mean, that's something. That's a right of the people. Does the zoo have the responsibility of having free days for the public? There is, yes, 15% or something less than 15%. And that's mandated by who? That's mandated by the statute that permits forest reserve districts to have private zoos on their property. It says that they have to be open one day a week to the public. And what are the provisions outside of that mandate? What can they do, close it to the public? Well, actually what it says is that that is, even though they're required to have it open one day a week, that the zoo management has the authority to determine what rules, regulations, and requirements that are necessary for the safety of the people that are coming in to adopt. So if they have that one day open and there's too many people that are coming, then the zoo management can make whatever regulations are necessary for the orderly operation of the zoo. So the legislature says, have it open one day free per week, but you can make whatever rules or regulations you think are appropriate to make sure that it works properly. And I quoted that in my brief. I think the things we have to look at is who exercises ownership control over the corporation. It's not a private corporation. Clearly the government does not exercise any ownership or control over the not-for-profit. Who has control over the means and method? The zoo does. And the zoo is not government-funded. It may be government-funded as low as 1% or 2% based upon the facts here, but probably less than 50%. But we know it's less than 50%. Thank you. And again, we'd ask that you confirm. Thank you, Council. Mr. Reese. Well, first of all, let's get a couple things straight. I think the plaintiff misspoke on a couple of things. First of all, the Tort Immunity Act has abolished the concept of government functions. Almost 20 years ago, in in-ray Chicago flood litigation, the court said that the old proprietary versus government function test is abolished. So if counsel starts talking to you about whether a zoo is performing a government function, that's not the test. The test under Carroll, and the court helpfully summarized it at the end of its opinion, is public business is a business of government, and a local public entity must be owned or operated and controlled by a local government unit. In addition to whether the activity has to benefit the entire community without limitation. So we're talking here about relevant aspects of ownership and control, but government function is not part of the test. Secondly, he talked about museums are specifically mentioned in 1-206. It's not museums, it's museum districts. Museum districts are not museums. My only point is that not-for-profit corporations organized for the purposes of conducting public business is a broad term, to be broadly construed according to Hubble. It is a catch-all provision inserted by law in 1986 to broaden the concept beyond what was otherwise enumerated in the statute as local units of government. It's not surplusage, it has to have some meaning independent of that. Okay, let's go back with that in mind over some of the things the council talked about. One, we are not asking the court to overrule Carroll. We want the court to apply Carroll to recognize that ownership in this context has to be ownership of the property, not the business itself, because the business doesn't have shares that can be owned by anyone. Council was talking about how, well, the zoo is merely a cultural institution. But I think Justice Burke made the point of free public access. And it's not just, well, the zoo's open one day a week to anyone who comes in for a stroll. It's also open the year-round for organized groups of Illinois school children because it has an educational purpose as well as providing benefits to the public and the community without limitation. It has an educational function. Council talks about Omelia. In Omelia, you had a symphony orchestra that had subscribers. And if you wanted to go to the symphony, you had to pay for the privilege. The court recognized that the symphony existed for the benefit of its members. You had to pay to get in. It was not subject to a mandate of free public access, unlike this case. The relationship between the zoo and the district is not a mere landlord-tenant relationship. The district's not charging rent. The district is intimately involved in every aspect of the business. Is there anything in the record to show that the district vetoes or has the ability to veto or has vetoed any action by the zoo? Well, Justice Tice, if you look at paragraph 5 of the agreement, I was going to get to that, but thank you, it says that after the budget is submitted, it's passed upon by the commissioners and all items which are not expressly disapproved of are considered approved. So they have a right to veto. Now, the record doesn't show how often that's occurred. And I would like to think that if you had a good relationship between the district and the zoo, that would not occur. But in terms of accountability for the expenditure of public funds, the district reserves the right to veto. And that's what's important. Not whether it's ever been exercised, because obviously, based on the relationship, there may never be a need, an occasion to veto. Mr. Reese, just to follow up on that, that's only to the public funds that according to your pleadings are somewhere between 49% and less. Correct. And I would have to say, in all honesty, that in a time of financial challenge where there is a limit on public support, private sources take on a greater role. But I want to talk about private sources for a moment. Okay. We have a law. The law says that you have mandated free public access. Let's suppose I'm a visitor. I stroll in one day. I want to park my car. Who decides how much gets charged for parking the car? Government. Under this agreement, the district decides how much gets charged for parking the car. And any money from the parking fee goes straight to the care and upkeep of the animals at the zoo. I stroll in. I have to go for admission. Who's going to decide what I pay government? If I get in for free during a free day, if I'm part of an organized group of school children, I get in the year-round. If I pay, fine. I start strolling around. I'm looking at the animals, the collections. If the zoo wants to remove an animal from exhibition, it has to get the assent of government. If it wants to sell off an animal from a collection, it has to get the assent of government. If it does get the sale proceeds, the proceeds have to be devoted to the upkeep and augmentation of the zoo. So there are these limits. It is not a mere landlord-tenant relationship. Council spoke about Brock for a moment. Brock was a Seventh Circuit case that only addressed the issue of whether the zoo is subject to OSHA or whether it is exempt as a political subdivision. Let's be very clear here. Under OSHA, there is an exemption for political subdivisions. We're not claiming we're a public subdivision. What we are claiming instead is that Brock is limited to the issue of whether or not the zoo is a political subdivision. It doesn't address Carroll. It doesn't address the Tort Immunity Act. It doesn't address the concept of public business. In fact, the law was amended in 1986, which is one year before Brock came down. So at the time that Brock was decided, the statute really had not been interpreted as amended to include this broad catch-all category of non-public corporations organized for purposes of conducting public business. I know it's a privilege to address the court in oral argument. If there is anything that I would ask you to take away from my argument this morning, it is, first of all, that this case presents specific issues that are not present in all other cases that have come before this court in the past. We have a mandate of free public access. We have direct public funding through a tax that has to be kept in a specific fund dispersed for purposes of the upkeep of the zoo. We have notions of ownership that cannot be based upon concepts of a private corporation for profit with shares, but a non-profit that has to be based on a property critical to the mission of the non-profit. We have representation on government bodies, and we have significant control over zoo operations. One last thing before I sit down. Counsel referred to paragraph 3 of the agreement that talks about the zoo having control and management, it's important, of the park and its collections. Counsel's right. When it comes to the care and feeding of animals, the zoo has that control and responsibility. When it comes to the upkeep of the premises, the zoo has that responsibility. But when it comes to operational control, whether we're talking about money, whether we're talking about the visitors, two million of whom visited the zoo last year, whether we're talking about significant oversight and representation on governing bodies, that is reserved to the district. Thank you, Counsel. We again ask you to reverse the appellate court and to approve the trial court. In case number 118254, Christine O'Toole versus the Chicago Zoological Society will be taken under advisement as Agenda 20. Mr. Reeses and Mr. Brugess, thank you for your arguments this morning. You are excused at this time.